UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

In re:

JaVon Patrick and Adonna Patrick,                          Case No. 13-47175-wsd
                                                           Hon. Walter Shapero
            Debtors.                                       Chapter 13
_____/

National Claims Service, LLC,
                                                           Adv. Pro. No. 13-04585
            Plaintiff,

v.

JaVon Patrick and Adonna Patrick,

            Defendants.
_____/


## OPINION

### BACKGROUND

JaVon Patrick and Adonna Patrick are a married couple who own a home in Southfield,

Michigan that was insured by State Farm Casualty Company. On December 10, 2011, a fire

damaged the Patricks' home and its contents. The Patricks engaged National Claims Service,

LLC ("NCS") as an insurance adjuster and on December 12, 2011 executed a Residential Public

Adjusting Contract ("Adjusting Contract"), which among other things, entitled NCS to 10% of

the total insurance claim paid to the Patricks, comprised of the claims for the dwelling and its

contents. The Adjusting Contract also provided that the Patricks authorize and instruct their

insurer to pay NCS its adjuster fee by way of a separate check. However, the insurer ignored the

"separate check" provision, which, as NCS's principal Mark Plaskov testified, was common for

insurers to do. State Farm tendered a check to Mr. Patrick on February 8, 2012 for the dwelling

part of the claim in the amount of $114,823.81, made payable to Mr. Patrick, the mortgagee JPMorgan Chase Bank, and NCS ("Dwelling Check"). In connection with the Patricks' contents claim, around March 2, 2012, State Farm issued a separate check to NCS for its 10% fee, which amounted to $3,293.14, and a separate check to the Patricks.

For some time, Mr. Patrick had grown increasingly dissatisfied with NCS's services because he found that Plaskov was rarely available to answer questions or concerns. Around February 21, 2012, Mr. Patrick "fired" NCS. Plaskov testified that he did not view this as a valid termination of NCS's services because it was not in writing and was outside the time limit within which Mr. Patrick could terminate, as provided by the terms of the Adjustment Contract and applicable state law. Plaskov testified that NCS continued performing its services despite Mr. Patrick's attempted termination. Mr. Patrick also stated that NCS failed to discover and include in the claim certain additional claimable damage to the premises that his contractor later discovered. However, this discovery was admittedly subsequent to Mr. Patrick's effort to terminate NCS, so it could not have had a bearing on his decision to terminate.

When State Farm delivered physical possession of the Dwelling Check to him, Mr. Patrick took it to NCS for its indorsement so that he could deposit those funds and use them to pay whomever was entitled to be paid, including the contractor. NCS refused to sign the Dwelling Check, kept it, and refused to return it to Mr. Patrick until he paid NCS the remainder of its fee by separate certified funds. This dispute regarding possession of the Dwelling Check exacerbated the already tense situation between Mr. Patrick and NCS. On or about March 8, 2012, Mr. Patrick filed a complaint with the Michigan Department of Licensing and Regulatory Affairs (LARA), which regulated Plaskov's adjuster's license. On March 12, 2012, Plaskov filed a response letter with LARA giving his version of the events. Regarding the retention of the

Dwelling Check, he wrote "Insured picked up the check from State Farm along with estimate and brought check to National Claims Service to hold it since the building claim was not settled and no agreed price was reached since State Farm estimate was reduced." Ex. 9-6. On March 16, 2012, LARA responded to Plaskov with a letter requesting additional information and stating "Also, please explain how holding the structural check is in compliance with the Michigan Insurance Statute and the contract given to Mr. Patrick." Ex. 9-8. On March 22, 2012, Plaskov responded to LARA, stating in relevant part:

> Please be advised that the building claim and the contents claim was not settled at the time the insured dropped off the check to our office. The insured was aware of this and requested the check to be held until the building claim was settled. The claim was still in the negotiation stage and the contents claim was not settled. Therefore the adjusting fee was unable to be determined.
>
> Per the signed adjusting contract the insured must satisfy the 10% adjusting fee for the building & the contents claim. The building check was made payable to the insured, National Claims Service and the mortgage company. Per the State approved adjusting contract State Farm did not honor the separation of the fee per paragraph #4 Authorization of the contract. Please be advised the mortgage company does not honor public adjusting contracts and does not issue payments to the public adjuster. Therefore the insured must satisfy the adjusting fee.
>
> The adjusting fee must be paid by the insured or satisfied by a compromise with the insured. State Farm did honor the fee separation for the contents claim but did not calculate the fee correctly.
>
> This leaves an issue do [sic] to the new adjusting contract. Most insured's [sic] pay the entire fee out of the contents claim settlement and National Claims Service endorses the building check to the insured so they can forward it to their mortgage company or provide it to their contractor so they can begin the repair process.

Ex. 9-7.

Essentially, this correspondence indicates that at that time, NCS took the position that Mr. Patrick consented to NCS taking and retaining the Dwelling Check because (a) NCS was engaged in ongoing negotiations with State Farm in order to obtain a larger settlement and (b) NCS's adjuster fee was still outstanding and indeterminable at that time. The Court finds that

such position is not credible. The greater weight of the total evidence, including Mr. Patrick's more credible testimony, indicated that Mr. Patrick did not consent to NCS's retention of the Dwelling Check and that NCS retained it despite Mr. Patrick's repeated protests. Further, if NCS was genuinely concerned about a possible increase in the insurance settlement impacting the final amount of its fee, it could simply have returned the check to Mr. Patrick unindorsed, which would have preserved the status quo until a final settlement was reached. The Court finds that the motive in retaining the Dwelling Check and insisting that the Patricks pay by separate funds was to avoid a situation where the mortgagee refused to pay NCS its fee and where the Patricks were unable or unwilling to pay NCS out-of-pocket. This conclusion is substantiated by Plaskov's testimony, which essentially admits to such.

As this dispute over possession of the Dwelling Check continued, the Patricks' contactor was not being paid and had almost altogether stopped working on the home. Meanwhile, the Patricks and their children were still displaced. On March 28, 2012, NCS entered into a contract with Mr. and Mrs. Patrick ("Settlement Contract") requiring that (a) the Patricks satisfy NCS's fee by paying it $14,500 in certified funds (which apparently was slightly less than what NCS would have otherwise been entitled to under the Adjustment Contract); (b) NCS indorse the Dwelling Check and return it to the Patricks; (c) NCS and the Patricks sign a mutual release of liability; and (d) NCS and the Patricks send a signed letter to LARA indicating that the Patricks' complaint had been resolved.[1] NCS received from Mr. Patrick a cashier's check for $14,500 and, being satisfied with the Patricks' performance on the Settlement Contract, contemporaneously indorsed the Dwelling Check and returned it to Mr. Patrick. Unbeknownst to NCS at the time, shortly after Mr. Patrick had purchased the cashier's check from his bank (using funds from the

---

[1] Although Mrs. Patrick was not a payee on the Dwelling Check, NCS apparently insisted that she sign the Settlement Contract.

contents claim settlement), he had falsely reported to the bank that the check was lost, the effect of which was that the bank cancelled the check and returned the funds to the Patricks' joint account. Notwithstanding that, Mr. Patrick tendered the cancelled check to NCS without indicating that it had been cancelled. NCS later discovered this fact after it attempted to deposit the cashier's check. Quite candidly, Mr. Patrick now admits that he falsely reported the check lost, that he knew the check was worthless, that he gave it to NCS with intent to induce NCS to turn over the Dwelling Check, and that at the time he signed the Settlement Contract, he did not read it or intend to honor its terms. Mrs. Patrick also signed the Settlement Contract without reading it, but was unaware of her husband having cancelled the check. When she later learned of this, she was "shocked." The Patricks did not at any later point pay NCS any sums.

NCS commenced a civil action in Oakland County Circuit Court and obtained a default judgment against the Patricks. The Patricks filed this Chapter 13 bankruptcy. NCS filed an unsecured proof of claim stemming from the default judgment and then filed the present adversary proceeding for nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). The Court held a trial.

### DISCUSSION

#### *11 U.S.C. § 523 (a)(2)(A)*

Under this section, a debtor shall not be discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" Because this statute is phrased in the disjunctive, it contains three separate (albeit nuanced) grounds for nondischargeability. Rakich v. Jagiello, 2013 WL 4068166, *5, 8 (Bankr. E.D. Mich. 2013) (citations omitted). "'False pretenses' for purposes of

Section 523(a)(2)(A) then may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective." Id. at *14-15 (quoting In re Kovler, 249 B.R. 238, 261 (Bankr. S.D. N.Y. 2000)). False representation requires proof that:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

In re Grenier, 458 Fed. Appx. 436, 438 (6th Cir. 2012) (quoting In re Rembert, 141 F.3d 277, 280-81 (6th Cir. 1998)). Actual fraud, which is broader than misrepresentation, encompasses any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another. In re Hermoyian, 466 B.R. 348, 379-380 (Bankr. E.D. Mich. 2012) (quoting In re Vitanovich, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)). A creditor bears the burden of proof by a preponderance. Grogan v. Garner, 498 U.S. 279, 291 (1991).

As to Mr. Patrick's conduct, the Court finds that NCS met its burden of proof. He obtained money or property (i.e. the indorsed Dwelling Check) in a reciprocal transaction. Mr. Patrick was aware that to obtain NCS's indorsement on and delivery of the Dwelling Check, he falsely led it to believe that the cashier's check was legitimate. In doing so, he acted with premeditation and fraudulent intent. NCS reasonably and justifiably relied on Mr. Patrick's actions and had no reason to question the legitimacy of the cashier's check.

As to Mrs. Patrick's conduct, the Court finds that NCS did not meet its burden of proof. Her testimony and the totality of the evidence indicates she was wholly unaware of her husband stopping payment on the cashier's check and she did not have any culpable intent. Although her husband's unlawful conduct caused the $14,500 to be returned to the Patricks' joint bank account

and although Mrs. Patrick took no subsequent steps to pay NCS the $14,500 pursuant to the Settlement Contract, at the most, this would amount to Mrs. Patrick breaching a contract or failing to pay a debt, neither of which, without more, give rise to nondischargeability.

*11 U.S.C. § 523(a)(6)*

Under this provision, a debtor shall not be discharged from any debt for willful and malicious injury to another. The terms "willful" and "malicious" are distinct and separate concepts. In re Martin, 321 B.R. 437, 440 (Bankr. N.D. Ohio 2004). The injury must have been both willful and malicious, not just the act giving rise to injury. In re Little, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005). To establish that a defendant willfully injured it, a plaintiff must show that the defendant either acted with an actual intent to cause the alleged injury or a belief that the alleged injury was substantially certain to result from his act. Phillips v. Weissert (In re Phillips), 434 B.R. 475, 483 (B.A.P. 6th Cir. 2010) (citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463-64 (6th Cir. 1999)). "The term malicious is defined as conduct taken in conscious disregard of one's duties or without just cause or excuse." In re Little, 335 B.R. at 383-84 (quoting Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986)). A creditor bears the burden of proof by a preponderance. Grogan v. Garner, 498 U.S. 279, 291 (1991).

Alternatively to the § 523(a)(2)(A) claim against Mr. Patrick, the Court finds that NCS met its burden of proof under § 523(a)(6). As noted, he knowingly gave NCS the worthless cashier's check to induce it to indorse and turn over the Dwelling Check. In doing so, he caused NCS to incur a financial injury by forfeiting money or property in exchange for worthless consideration. Not only was such injury substantially certain to result from Mr. Patrick's conduct, but he also essentially admitted that he intended to get revenge against NCS for what he perceived as NCS's own bad acts, testifying at his deposition "I wanted to do what National did to me." Ex. 7, pg. 10.

This conduct was in conscious disregard of his duties under the Settlement Contract and his general duties in carrying out the transaction in good faith. As will be discussed further, Mr. Patrick's conduct was without just cause or excuse.

As to Mrs. Patrick's conduct, the Court finds that NCS did not meet its burden of proof. Her testimony and the totality of the record indicate she was wholly unaware that her husband stopped payment on the cashier's check and she could not have any culpable intent. At the most, her conduct would amount to breach of contract or failure to pay a debt, not to a willful and malicious injury.

## *Mr. Patrick's Asserted Defenses*

First, Mr. Patrick argues that he does not owe NCS any debt under the Adjustment Contract because he terminated the contract and fired NCS. Mr. Patrick has not met his burden of proof on this defense because there is no indication that he complied with the contractual requirements that cancellation be in writing or that it be accomplished within the applicable time limit. In any event, had he effectively cancelled the Adjustment Contract or had NCS initially breached it, his entry into the subsequent Settlement Contract either reaffirmed the Adjustment Contract or created a new obligation to NCS.

Second, Mr. Patrick argues that he does not owe NCS any debt under the Settlement Contract because he signed it under economic duress. In essence, Mr. Patrick argues that NCS's conduct of improperly taking and retaining the Dwelling Check was tantamount to extortion, particularly given the hardship Mr. Patrick and his family were experiencing as a result of the fire damage to their home.

> To justify a court in rescinding a contract on the ground of duress, the testimony should be cogent and the case made out by a clear preponderance. The burden is upon complainant to make her case, and the testimony, as a whole, ought to be

> sufficient to overcome the presumption that the contract was freely made, and was
> one of fair dealing.

Lewis v. Doyle, 182 Mich. 141, 150-51 (1914). "As early as 1881, the Michigan Supreme Court held that illegal action is a necessary element of economic duress." Whirlpool Corp. v. Grigoleit Co., 713 F.3d 316, 324 (6th Cir. 2013) (citing Hackley v. Headley, 45 Mich. 569, 574 (1881). Mr. Patrick contends that the Court should adopt the proposition that "economic duress can exist in the absence of an illegal threat; the threat must merely be wrongful." Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp., 749 F. Supp. 794, 797 (E.D. Mich. 1990). Although Whirlpool Corp. commands greater deference because it is more recent and is binding authority, Mr. Patrick's economic duress defense would fail by either standard.

Mr. Patrick has not met his burden of proving that NCS's conduct in holding the Dwelling Check was illegal or tortuous. The record is devoid of any substantive discussion of the laws and regulations governing whether licensed public adjusters can do so, aside from his general allegation that NCS "converted" the Dwelling Check. Although LARA asked Plaskov to explain how holding the check was lawful, at most this establishes LARA's skepticism as to such. Without more, that is insufficient to prove this conduct was indeed unlawful. The court in Kelsey-Hayes, which held that the economic threat need not be illegal, opined that "a contract is voidable if a party's manifestation of assent is induced by an improper threat by another party that leaves the victim no reasonable alternative." 749 F. Supp. at 797. Here, although Mr. Patrick felt like he was being mistreated by NCS and was dissatisfied that his LARA complaint did not quickly remedy the situation, proper alternative remedies should have been explored and may have been available, which might also have satisfied the Patricks' apparent urgent need of the Dwelling Check funds in order to pay their contractor.

For similar reasons, Mr. Patrick has not met his burden of proving the doctrine of unclean hands, for which he has the burden of proof. In re Murphy, 331 B.R. 107, 135 (Bankr. S.D.N.Y. 2005). Unclean hands "closes the doors of equity to one tainted with inequitableness or bad faith relative to the matter in which he or she seeks relief[.]" Yuille v. Am. Home Mortgage Servs., Inc., 483 Fed. Appx. 132, 135 (6th Cir. 2012) (quoting Richards v. Tibaldi, 272 Mich. App. 522, 537 (2006)). It is questionable whether this doctrine is applicable to nondischargeability proceedings, which seek statutory relief, not equitable relief. In re Hatch, 465 B.R. 479, 494 (Bankr. W.D. Mich. 2012). In any event, the record does not support a finding that NCS was acting unlawfully or in bad faith.

### *Damages*

Mr. Patrick (but not Mrs. Patrick) is liable for a nondischargeable debt in the amount of actual damages of $14,500. NCS argues that damages should be trebled pursuant to Mich. Comp. Laws § 600.2919a, which provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> > (a) Another person's stealing or embezzling property or converting property to the other person's own use.
> >
> > (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

As the Court noted in its preliminary ruling at the start of the trial, this statute is properly interpreted to allow for recovery of three times the amount of actual damages, not three times the amount of actual damages *plus the amount of actual damages*. New Properties, Inc. v. George D.

<u>Newpower, Jr., Inc.</u>, 282 Mich. App. 120, 138 (2009). "[T]reble damages are permissive. Therefore, the trier of fact has the discretion to decide whether to award treble damages[.]" <u>LMT Corp. v. Colonel, L.L.C.</u>, 2011 WL 1492589 (Mich. App. 2011).

It is evident that Mr. Patrick acted out of frustration in order to achieve a result that he believed to be fair to him. To remedy this frustration, however, he chose a course of self-help conduct that was unjustified. Given the totality of the circumstances, the Court believes the most equitable and appropriate outcome, and the most proper exercise of its discretion, is to afford the parties their obligations and bargain under the Settlement Contract. Accordingly, the Court will not exercise its discretion to award treble damages, costs, or attorney fees.

The Court will contemporaneously enter an appropriate order.

Signed on April 14, 2014

                                    /s/ Walter Shapero
                               Walter Shapero
                               United States Bankruptcy Judge